Miami-Dade County Transgender male parts, female tendencies. Didn't the doctor also ask Ms. Pichardo whether she had all of her genitals and whether she had had surgery on her genitalia? Yes. And Pichardo said she did have all of her genitals and she did not have surgery on her genitalia. Correct. And yet he still didn't physically examine her. No. But he had enough of a question that he asked her these things. Apparently. Well, the question actually indicates his subjective belief that she was transitioning, does it not? Or had transitioned. I mean, I'm not sure that indicates a mental state of the doctors that helps you. The only reason you would ask if somebody still had all their genitals or had surgery on their genitals is if you subjectively believed that they were transitioning or had transitioned. Am I missing something, Cal? We would say that if he's asking these questions and he doesn't follow up with a physical examination, we think that evidence is a deliberate indifference to the risk of misclassifying her, which is exactly what occurred here. So if he asks questions that indicates his subjective belief that she's transgender or is transitioning, that's worse off for his subjective knowledge about whether she's a female or male. Well, again, under the test adopted by Farmer, the claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate. It's enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm. If he's unsure whether or not she's male or female, he signs the form saying deferred on the question of genitals on the form. He says deferred, which means that she gets searched later. But at the same time, in concluding with her, he agrees that he's sending her to the male population. So he's sending her to the male population yet deferring on actually searching her. By searching, you mean strip searching. Correct. Did you ever figure out why they don't just check the booking? Did they ever give an explanation? I know you were at 12B6, but... What do you mean? Why didn't they just look at the booking? Don't the doctor and nurse know they're strip searched? Or maybe they don't know that. Is everybody strip searched that comes into the jail? Yes, but I don't know if the doctor or the nurse acknowledges that they know that. But it's certainly in the record when they come in, whether or not they're male or female. She comes in as a female. Well, somebody here told the nurse, you allege, that Moorman told Nurse Harris that Mrs. Picardo had been booked and classified. I guess you don't allege. She told him she'd been strip searched. But then you do allege that Jones asked Harris at least three times whether she had strip searched or physically checked Picardo's anatomy. Yeah, which she sidestepped. All right. And she said she had or that booking had? All she said was, quote, she's a man. That's Nurse Harris. Correct. Chief, any other questions? No, thank you. Thank you, counsel. Thank you. Thank you. Before you start, can I ask the chief, I've got the complaint here, can you direct me to the paragraphs that are problematic, if you have it right there before you? But if not, that's fine. Yes, I do, Judge. It's paragraphs 12. Now these alternate between the doctor and nurse. 12, 13, 50, 93, 95, and 105. 12, 13, yeah, 12, 13, 50, 93, 95, 105. Thank you. May it please the court, counsel, members of the panel, my name is Bernie Pastor, and I speak on behalf of Dr. Rodriguez-Garcia. Good morning. The issue here is whether a prison doctor's mistake, and we've all agreed that this was a mistake, in making a gender determination amounts to subjective intent to punish in violation of the Eighth Amendment, particularly when the plaintiff has pled that the doctor's mistake was based on his belief that the plaintiff, that the inmate, was a man. The district court correctly found that the plaintiff failed to plead the requisite subjective knowledge to maintain a deliberate indifference claim against the doctor. Now based on the allegations, the doctor, of course, mistakenly concluded that the inmate, that Ms. Bicharda, was a male, transgender. There's no doubt about that and that it was a mistake for which there are remedies and there are claims in state court, state court claims for medical malpractice, even negligence. But nothing in the pleading suggests or alleges, more importantly, that the doctor took action or failed to take any inaction with subjective intent to impose her to a substantial risk of harm or to punish. And when we look at the pleadings, and I know we've spoken a lot about the nurse, but with the doctor, the facts are far more discreet and limited. And they're simple. Doctor sees patient. Doctor sees the patient for about four to five minutes. No knowledge of what went on outside. All this going back and forth between Officer Moorman and Nurse Harris and all the other corrections officers outside, the doctor has no knowledge of that. Doctor notes that the patient is taking hormone replacement therapy. Doctor knows that hormone replacement therapy, as alleged, is taken in two scenarios, menopausal women and transgender men. And this is the key. What do we make, though, of the fact that the doctor purposely didn't ask for hormone replacement therapy because it was, quote, a difficult question to ask? Well, he does ask questions. I mean, he makes the mistake. Right. But he doesn't ask why you're taking, he doesn't say why are you taking hormone therapy, and he makes a conscious decision not to do it because he thinks it's a difficult question to ask. How does that fit into the analysis? It doesn't express, it doesn't show that he subjectively intended to punish her, that he subjectively believed that he was placing her in harm because he believed she was a man. And the mistaken assumption. But doesn't it show that he may have had some question as to whether she was a man or a woman? Well, and he did ask questions. And in retrospect, we can argue that they were inartful or ambiguous. He asked her, well, he sees HRT on the medical record, he assumes mistakenly that the inmate is a man. Then he proceeds to ask a few questions. Do you have all your parts? But then he says also, in addition to saying he didn't ask why she was taking hormone replacement therapy, because it was a difficult question to ask. He also says he was too uncomfortable to ask her whether she was a male. So we have sort of these two kinds of issues that are creeping up in his mind. And he has made conscious decisions not to ask them, even though he knows that sending a woman into a male's facility is extremely dangerous and a clear and obvious danger. What do we make of those two facts? That doesn't rise to the subjective knowledge that's required on the Eighth Amendment. Again, he asked the two questions, which in his mind, and it was wrong, in his mind it confirmed. The nature of the questions he asked assumed his mistaken impression, which was she was a man. So do you have your sex parts? Yes. That confirms his mistaken assumption. Have you had any operations? No. That, again, confirms his mistaken assumption. Then he receives these answers. He makes a notation on the record, and then the patient leaves. That is the sum total of the interaction that the doctor had with the inmate. Now, was he remorseful later? Of course. Was he disciplined later? Yes. Was he ordered to go through training? Yes. But nothing in the pleading suggests that he subjectively knew that she was a woman or that he was placing her in harm. And when we look at the pleading, I believe Chief Judge mentioned several allegations that were pertinent to the doctor. But I think what's even more telling is to look at the allegations as to the remaining co-defendants at the time. There were five other co-defendants, corrections officers, who had varying degrees of interaction with Ms. Pichardo. And in paragraphs 5 through 11, with respect to each and every one of the five co-defendants that were correction officers, and with respect to the Jane Doe, and with respect to the John Doe's 1 through 10, paragraphs 5 through 11, in each instance, there is a specific allegation that they all believed she was a woman. When it comes to the doctor in paragraph 12 of the complaint, we have what's already been discussed, which is what you mistakenly believe it was an error. It was a clear error. And so, throughout the initial... But isn't that kind of a red herring? I mean, what does it matter what she alleges with respect to people who she hasn't appealed about? It goes as to the issue of knowledge. I mean, they specifically pled at least seven times, with seven different individuals, actual knowledge that Ms. Pichardo was a woman. When it comes to the doctor, they plead that the doctor believed, albeit mistakenly, believed she was a man. What you're saying is those pleadings compared to paragraphs show that they knew how to plead actual knowledge and the absence of actual knowledge. And 12, by the way, and this actually, if anything, is more favorable to you, but on paragraph 12, what they say is the doctor wrongfully concluded. They don't talk about believed, just concluded, reached the judgment that. But, still, that doesn't let your client completely off the hook because that shifts us to paragraph 8 of Farm... I'm sorry, footnote 8 of Farmer, that says you can also have liability if the defendant was aware of a high probability of facts but resisted opportunities to obtain final confirmation. Simply, I'm not sure that's offered as an alternative to actual knowledge. And if there's a high probability of facts from his perspective, from what he's told, that he resisted opportunities to obtain final confirmation, he's still liable, or at least that's still deliberate indifference route. I think if he had just seen the record and done nothing and just classified her immediately, that, perhaps, could rise the level of subjective knowledge or an inference that there was a subjective knowledge. If he had actually went ahead and physically examined her and saw and confirmed her through checks and sent her anyway, that would be. Yeah, but we're not talking about subjective knowledge now. We're talking about subjective awareness of a high probability of facts but not determining whether or not the fact is true or not, actually resisting an opportunity to find out whether the high probability was true or not. I mean, that's what footnote 8 says. Right, but again, in our situation, he mistakenly just assumed, thought, believed, consciously thought that he was a man. And if he thought that, despite asking several questions in light of that, he could not have formed the subjective knowledge. He did that based on what? Just that she was taking hormone replacement. That was the only thing he did, right? That's it. And it just says hormone replacement. And I'm not getting to the test yet. I'm just trying to understand the facts. I'm looking at the memorandum, April 1, 2014, that summarizes the medical records, and I just want to make sure. So the doctor had, though, when he saw hormone replacement, in the records right next to it, it says menopause medical. Is that correct? What page are you looking at, Your Honor? On that report, it's page 12 of 34, paragraph 23B. That's the incident report, I guess, or the investigation. The medical records for her were received, and they reflect the following. CHS prescreening assessment form dated November 4 at 644. I think that's the day she went to medical, right? That was part of the prescreening, right? Right, right. She's in prescreening, and November 4, 644, she's in the medical room, unit, whatever, under comments, quote, menopause medical. Then it says, it also reflects question four, she takes Ativan for end hormone replacement. Well, first of all, Ativan's not a hormone replacement, so that was kind of weird. But let's just assume it's that reference to hormone replacement your doctor relied on, correct? It's unclear that that record, because there are booking records, it's unclear, and I turned to pay. But their booking records, they're going to show something else to the female. It is unclear. It's neither alleged, nor is it contained in that report, whether he saw that paper. But this document was part of what y'all admitted for purposes of the motion to dismiss, right? The document itself, I don't believe, was part of it, remember. Okay. So we have to take this case as part, even on a motion to dismiss, that the doctor had next to hormone replacement, in that same prescreening, menopause medical, right? Assuming he saw it. Okay. So if you see, well, he sees hormone replacement. And so next to it, or on the same form, says menopause. That's what the hormone replacement's for. Why is this deliberately indifferent? Because, again, let's pledge that he believed, mistakenly, after the questions that, despite his questions, that the inmate was a man. You should have said, you should have phrased it differently. The wrong way to conclude it is what you're saying. All right. And I'm running out of time, and I want to dig into that. But we also would argue that there was a failure to plead the Eighth Amendment violation. As a result, there was no underlying constitutional violation, which then bleeds into the issue of qualified immunity, which has two parts. And we argue as well, as we did in the brief, that the issue of clearly established wasn't raised below, so it was waived. And then it wasn't raised in the initial brief either, as to the clearly established. Counsel, you're running out of time, so you're actually out of time. But if you want to briefly conclude. And that's it. So we believe that the district court's opinion with respect to the doctor should be affirmed. Thank you. Thank you, Mr. Pastor. May it please the court, Aleda Mielke on behalf of Nurse Harris. The district court was correct in dismissing the plaintiff's second amended complaint, because as this court has pointed out, and as Judge Karnes indicated, the plaintiff failed to allege that there was actual knowledge on the part of Nurse Harris, such that there was a deliberate indifference to the substantial risk of harm by inmate Pichardo. But did you want to address the chief's question with respect to the eighth footnote in Farmer? Yes. So I would respectfully disagree that Nurse Harris resisted opportunities to obtain confirmation. What we know from the allegations and looking at the report is that Nurse Harris concluded as this plan, that this inmate was a potentially a transgendered male. And because of hormone replacement, she then had a conversation with officer Mormon.  She's a female. And nurse Harris again said, we'll check out. We'll see. And then she took the inmate along with officer Jones and escorted her to the evaluation where she was to be seen by a physician in transit. There's the allegation, which nurse Harris denies in her sworn statement, which is also part of the license. It's a motion to dismiss. We have to take it in the light, most favorable to the, to the plaintiff. Then nurse Harris had a conversation with the inmate in transit and asked her if she was a female and she had female parts. Keep in mind, however, that nurse Harris has stated that she doesn't speak Spanish. And the record is replete with evidence that the plaintiff only spoke Spanish. And then you get to the evaluation with the physician and the physician goes behind closed doors. There's absolutely no allegation that nurse Harris was present during the evaluation and whatever form that took up until this point, there has been no one who has addressed inmate Pichardo in a physician patient relationship in her native tongue in a closed room where they would have maybe a more forthcoming conversation. What plaintiff alleges without a doubt in this complaint consistently is that nurse Harris knew concluded, insisted that this was a male and to the extent that she had an opportunity to obtain confirmation, that confirmation came when Dr. Rodriguez Garcia on his own based on, as is alleged in the complaint, his own review of the fact that this inmate was on hormone replacement therapy, came to a similar conclusion at a different point in time that she was a transgendered male. So to the extent that she had opportunity to obtain confirmation in her mind, that confirmation came when this inmate had a closed door interaction and the physician, and it was after that evaluation that the physician comes out and says, this is a male. Didn't, didn't officer Mormon tell nurse Harris that Pichardo had been booked and classified as female? Yes, she did. And according to the allegations of the complaint, officer Mormon told her this upon the initial contact that nurse Harris had with the chart before she had ever seen inmate Pichardo. And didn't nurse Harris then tell officer Mormon that she would physically check Pichardo sex? Yes. She said, she did not check, she physically did not check, but it's not unreasonable for a nurse to rely on the evaluation of a physician in making the assessment of whether or not this is a male. I don't think that we can hold her to the standard of saying I'll check means only I will check, but that there was be some process in place by where the inmate would be checked. And as far as nurse Harris, would they allow the male to do it without a nurse witness? No. So she would have to be in there. And so she knew he hadn't checked. Well, not necessarily your honor respectfully because there's more than one way to skin a cat. So for example, there is a procedure in place whereby a nurse and a corrections office officer need to be present if there's going to be a strip search, but that's only if there's a doubt. So if Dr. Rodriguez had assured himself that he had no doubt, there is no need for that procedure. And if nurse Harris believed that Dr. Rodriguez had somehow obtained the information. For example, if he had asked her in her native language, in the private setting between a physician and a patient, are you in fact a transgendered male? And inmate Pichardo had said, yes, I am the doubt is erased in that physician's mind. And then there is no need to conduct the next onerous step of a strip search. You agree. The summary of the medical records that was an exhibit in the motion debate is part of the record here for our ruling. I do your honor. Okay. And do you agree the paragraph I've referred to you're, you're familiar with it. Yes, your honor. So we have to take this case that the doctor, when he looked at where it says hormone replacement, he sees on the same page menopause medical. Is that correct? I know you have a different outcome here, but we do have that in the record. Yes, your honor. The only reference of hormone in the medical record also has menopause medical. Yes. And is it correct that it says out of, out of an parent menopause? I mean, I can't say it right out of van parent hormone replacement. That's what's reflected in the record. Okay. And isn't there also an entry that nurse Harris, I know she denies having done it, but again, we have to take the allegations in the late most favorable to the plaintiff here. Isn't there an allegation that nurse Harris signed a medical health services incident addendum that says, quote, transgender male parts, female tendencies. Yes. And what's important to know about that specific action taken by nurse Harris is that this, that comes after. Dr. Rodriguez has evaluated the patient made the 2 AM notation that this is a male. And it only comes because officer Jones. After calling her, her supervisor, sergeant price. Guess a recommendation from sergeant price, make sure you have a notation in the, in the record when you're going to walk her down and take her back to the male side. So what that speaks to is that after a confirmation from the physician nurse Harris's doubt, if she had any, it's cemented and all that that shows that without a doubt, she had the knowledge that this was a male. Therefore there was no heightened understanding that she was going to be placing her in danger. If that's so, if that's so, then one has to wonder why she would deny having signed it. I mean, if her story is, well, that's what the doctor told me. So that's what I put down. Why does she deny having signed it? Well, what she said in her statement was I don't recall having signed for therefore. Yeah, I'm denying it. But then what she said is I relied upon what the physician said. And if you read officer Mormon statement, after the facts assessment, officer Mormon supposedly went to nurse Harris and said, what happened? And nurse Harris said, I relied on this physician. That was my mistake. I learned my lesson. So if we're going to take up the totality of the circumstances, and we should also look to the fact that yes, nurse, nurse Harris, after the fact denied it because she didn't recall it, but she also stated that she relied on this physician's closed door assessment one-on-one with his patient in her native language. And it was reasonable for her to lie that she, some of the things she said are inconsistent with other, you know, with other facts that are alleged in the record. For example, there's an allegation that she's the one who first brought up the fact that, that, or I guess the, the rationale that because Ms. Pichardo was taking hormone replacement therapy, that she must be a male who was transgender, right? Correct. I mean, so that's inconsistent with her statement as well. Again, since we're on a motion to dismiss, why wouldn't we take those allegations in the light most favorable to the plaintiff here? You could, and you would still, I would argue, come to the same conclusion. And more importantly, the district court did and looked at the allegations completely disregarded what nurse Harris said about what her motivation was and what, you know, her after the fact statements were in the complaint, in the order, the district judge goes through all of the inconsistencies, goes through the facts and, and relies almost solely on what is alleged in the complaint. So it's clear that the district court didn't consider it and still came to the conclusion that there wasn't the requisite knowledge for deliberate indifference in this case. Any further counsel, any further questions, Chief Judge? Chief? Yes, I'm sorry. I had my mute button on so you wouldn't hear me flipping pages. Counsel, let me ask you this. For present purposes, we have to take it as given that your client speaks Spanish, right? We have to take it as a given that she communicated with the inmate and elicited a response that she understood to be that she was not. Well, I've got the internal affairs report, April one, 2014, in front of me, which all incorporated into the 26 issue. And it says in the nurse Harris replied, she would check her out and they proceed to walk towards the cell. Inmate Pichardo only spoke Spanish. So nurse Harris communicated with her in Spanish. According to officer Mormon, inmate Pichardo's facial expressions appeared to be offended. So she asked nurse Harris what she asked her. And nurse Harris replied that she asked her if she was a female. And if she had female parts to which inmate Picardo replied affirmatively twice. So she's communicating with the plaintiff. Which is the only question about whether she could communicate in Spanish that matters in the, the, the reading this and the light, most favorable to the plaintiff. She could certainly communicate with the plaintiff in her native and plaintiff's native language. Well, again, recall that Mormon doesn't speak Spanish and what she's getting is a synopsis of what Harris communicated to the inmate. Yes, but, but Harris is, is telling Mormon in effect. Well, I communicated with her. This is what I asked. This is what she said. Right. Yes. And that we're speaking Spanish. So she can speak Spanish well enough to understand and be understood by the plaintiff, which is the only level of communication we're concerned with here. Right. But also consider that this communication is taking place in some sort of open setting where they're transiting from one location to another. It's unclear whether a inmate Pichardo understands that this is a nurse may think it's just another inmate. And if she is. And. Not another inmate. I apologize. Another officer. Yeah. But. And to the extent there's any lack of clarity there or any ambiguity, which way do we resolve those for 1236 purposes? Well, if there's any ambiguity, you have to take it in the light most favorable to the plaintiff. Right. Yes. And that doesn't take away from the fact that, that there was evidence that this was a female. We know that from the booking record. We know that from the purported statements that you. No, no, no, no. You were. You were saying that I gathered the point of your argument was that nurse Harris was less aware of facts or problems that might raise an inference that this person, the plaintiff was a female because she didn't speak Spanish. No, that's not what I meant. And I apologize if that's what the court. Well, then what, what did you mean? What I meant was that it was reasonable for a nurse Harris to think that she had in fact obtained the confirmation that's that we're talking about in footnote eight of farmer. When this patient goes into a closed room with a physician and is able to communicate in her native language. And that to me, that. Implying, implying that she couldn't communicate in her native language with nurse Harris. Why did you raise the point? I'm trying to understand your position that she, that nurse Harris didn't speak fluent Spanish. Because that's what nurse Harris testified to. I'm not asking you, I'm not asking you whether you had a basis for it. I'm asking you what the relevance of it is. The relevance is this, the totality of the circumstance of having an inmate in a room that she knows is a physician in a one-on-one conversation in a private setting with someone who speaks her native language. It would have been reasonable for nurse Harris to think that this physician came to a conclusion that was well-reasoned and substantiated by his evaluation. That was my only point in raising. Why does it matter to that point? Whether nurse Harris speaks Spanish or not. Because if she doesn't speak Spanish well enough, it may have been a miscommunication on either one of their parts. And the fact that she spoke Spanish well enough to ask the plaintiff these two questions and to get an answer from the plaintiff indicates that your point has no 12 B six quote factual end of quote basis. Right? No, it doesn't. Your honor, respectfully, because what the, um, the case law says is that yes, we have to take the light, most favorable, the allegations and the light, most favorable to the plaintiff. But to the extent that there's an, a document that is attached and it's relied upon heavily and that the, uh, the exhibits contradict what is in the pleading, then the court can consider those documents. And the exhibit confirms against your client, the point I'm making quote. So nurse Harris communicated with her in Spanish, end of quote. Correct. That is if you also, we should assume for this present purposes, 12 B six and these documents attached that nurse Harris can communicate and did communicate with the plaintiff in Spanish, because that's what the internal affairs report says. Yes. If you disregard nurse Harris's allegate a statement that she doesn't speak Spanish and didn't, which is what we're required to do for purposes of 12 B six, when there's a conflict in the allegations or in the documents attached to the allegation. Yes. And yes, the court, let me ask you, let me ask you one other question and it's just kind of lurking. I'm going to ask the plaintiff's counsel as well. The underlying assumption seems to be that if the plaintiff was transitioning it would be okay to put the plaintiff in a cell with 40 men. Is that the underlying understanding of the correction department that, that a, that someone who is transitioning faces no danger from being put in a cell with 40 men in a prison? No, I don't believe that. I believe that what the classification should be and was, is what was the biological genitalia of the inmate. And then that's the corresponding classification that they would have. But the record shows that even in this case where the inmate was believed to be a male with biological parts, transitioning to female, he was placed at the front of the line when he was being inmate. Peshawar was placed at the front of the line when they were being taken downstairs to have a better view. And she was placed in bunk two where she could be evaluated and seen more clearly by the guards. So. And that's enough for some, for somebody who is viewing the facts in the light most favorable to your client, which we're not supposed to do. But even that, it's a, it's a detainee, not a prisoner, but a detainee who is transitioning, who's different from the male, 40 males she will be put in to a cell with that. I mean, I'm just asking that. It just occurred to me, we get down into details in the overriding assumption is it's okay to put a transgender or transitioning person into a cell full of males, right? I believe it's not the first time that that takes place and that's why they have a designated bunk for where they put these males that are transitioning to females. But the designated bunk is not in a cell by itself. Not that I, that I understand as I understand that designated bunk was closer to the guard so they could keep a better eye, but it was in a cell with approximately 40 other males. Yeah. Which would be a guard running in before 40 males could harm the, the detainee who was in the cell with them. You also said that's if they had biologically completed the process or not biologically completed the process. You said biologically had genitalia consistent with a male, right? And that's where the air than transitioning. You're saying, no, no, this is a male who is transitioning to female, right? So they would have been born male, transgender to female. I'm trying to understand what is the requirement before they take someone transitioning or transgender to the male prison? My understanding is that there is a requirement of the genitalia. In other words, if the genitalia is biologically male, then it goes to the male assessment. And if it's a, the genitalia is female, it goes to female. Anything for the chief? No, no, thank you. All right. Thank you. Counsel. We've just heard nurse services council say that the determination has made upon the biological genitalia of the inmate. And yet that wasn't done here. A simple search could have made the determination here. If, as she says, the determination is based upon the biological genitalia. Defendants haven't set forth one good reason why the search wasn't conducted here. If they were going to change an inmate's gender from female to male, you have the nurse being specifically told by the inmate that she's female. You have her intake records indicating that she was trip searched and determined a female at booking. She's given the orange jumpsuit as a female.  The tab on her file says female. Now you had officers who didn't believe that she was male officers that were in place that could have prevented Mrs. Pichardo from being placed into the male population. Yet you had nurse Harris tell two different officers, not mistakes, not questions, but lies. You had nurse Harris tell officer Jones that she was a man when asked point blank if she was trip searched. You have a nurse Harris telling officer Mormon that when Miss Pichardo was searched in the doctor's examination, which she wasn't, that when she was searched everything quote fell out to which officer Mormon indicated to her that meant a penis and testicles. So you have nurse Harris making these affirmative representations based upon  She wasn't in the room. Um, Miss Pichardo never stripped for the doctor Rodriguez Garcia and you have nurse Harris writing this assessment, this addendum to the medical assessment saying quote male parts that wouldn't have come from the doctor because he never strip searched her. Um, we don't know where this came from. Now a lot has been made by the doctor's counsel as to what was pled that because it was pled that the doctor believed she was a, uh, she was a male that he has no liability here for deliberate indifference, but we keep, this is a 12 B six motion. We incorporate the internal investigation memorandum. We incorporate the doctor's, uh, the officer's sworn statements and here we have sufficient record evidence to establish that this, this belief was unfounded. Don't you, by using the word wrongfully instead of wrongly to modify concluded, does that allude to, um, the process that was used in order to come to this so-called conclusion as opposed to what the conclusion itself is? We keep coming back to this footnote eight and a failure to, to investigate when, um, when you strongly suspect, um, that facts may be true and you have the doctor's multiple, uh, declining multiple times to confirm this suspicions, I guess. I'm questioning whether or not she's a male because she's on hormone therapy when he also indicates that he is aware that premenopausal women take hormone therapy. So he is aware of the potential that she is in fact a female and yet undertakes no investigation to ascertain that and files his reports that says send her to the general population and deferring on the issue of her genitals, which means that there'll be checked later. So you have this report sending her to the male population without checking. Thank you counsel. I think we have your argument chief. Did you have anything further? Not a thing. Thank you. Thank you. Thank you. Thank you counsel.